CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ROLAND CHANG (CABN 271511)
SARA E. HENDERSON (CABN 329977)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7181
    Fax: (415) 436-7234
    Roland.Chang@usdoj.gov
    Sara.Henderson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-CR-0034 VC |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | The Honorable Vince Chhabria |
| RAMESH KRIS NATHAN, | Date: November 12, 2025<br>Time: 1:00 p.m. |
| Defendant. | Dept.: Courtroom 4 – 17th Floor |

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. FACTUAL BASES ................................................................................................................1

III. GOVERNMENT'S GUIDELINES CALCULATION ..........................................................3

    A. Nathan Used Sophisticated Means to Defraud His Victims ..........................................4

    B. As the CEO and Mastermind of Relativity, Nathan Abused His Position of Trust ....6

    C. Government's Responses to Defense's PSR Objections..............................................8

IV. GOVERNMENT'S SENTENCING RECOMMENDATION ...........................................11

    A. The Nature and Circumstances of Nathan's Offense.................................................11

    B. Nathan's History and Characteristics .........................................................................13

    C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense ...................................................13

    D. The Need to Afford Adequate Deterrence and Protect the Public from Future Crimes by Nathan .........................................................................................................14

    E. The Need to Avoid Unwarranted Sentencing Disparities ..........................................14

V. RESTITUTION AND FINE ................................................................................................15

VI. CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*,
  552 U.S. 38 (2007) .................................................................................................................. 11

*United States v. Aguare*,
  800 F.3d 1173 (9th Cir. 2015) .................................................................................................. 4

*United States v. Armstead*,
  552 F.3d 769 (9th Cir. 2008) .................................................................................................. 10

*United States v. Barnes*,
  125 F.3d 1287 (9th Cir. 1997) .................................................................................................. 7

*United States v. Blitz*,
  151 F.3d 1002 (9th Cir. 1998) .................................................................................................. 9

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) .................................................................................................. 11

*United States v. Chung*,
  No. 19-CR-00302, 2024 WL 4609597 (N.D. Cal. Oct. 29, 2024) ......................................... 10

*United States v. Fine*,
  975 F.2d 596 (9th Cir. 1992) .................................................................................................... 8

*United States v. George*,
  949 F.3d 1181 (9th Cir. 2020) ................................................................................................ 10

*United States v. Groves*,
  594 F. App'x 332 (9th Cir. 2014) ............................................................................................. 7

*United States v. Horob,*
  735 F.3d 866 (9th Cir. 2013) .................................................................................................... 4

*United States v. Intrieri*,
  594 F. App'x 406 (9th Cir. 2015) ............................................................................................. 6

*United States v. Jennings*,
  711 F.3d 1144 (9th Cir. 2013) .................................................................................................. 4

*United States v. Lawrence*,
  189 F.3d 838 (9th Cir. 1999) .................................................................................................... 8

*United States v. Martin*,
  455 F.3d 1227 (11th Cir. 2006) .............................................................................................. 14

*United States v. Milligan*,
  77 F.4th 1008 (D.C. Cir. 2023) ................................................................................................. 5

*United States v. Ressam*,
  679 F.3d 1069 (9th Cir. 2012) ................................................................................................ 11

### CASES (CONT.)

*United States v. Rubio*,
  579 F. App'x 609 (9th Cir. 2014) ............................................................................................. 4

*United States v. Stoddard*,
  150 F.3d 1140 (9th Cir. 1998) ................................................................................................. 9

*United States v. Stratos*,
  775 F. App'x 352 (9th Cir. 2019) ...................................................................................... 6, 10

*United States v. Tanke*,
  743 F.3d 1296 (9th Cir. 2014) ............................................................................................ 4, 6

*United States v. Tat*,
  97 F.4th 1155 (9th Cir. 2024) .................................................................................................. 7

*United States v. Terabelian*,
  105. F.4th 1207 (9th Cir. 2024) ............................................................................................... 6

*United States v. Tolbert*,
  704 F. App'x 646 (9th Cir. 2017) ............................................................................................ 5

### STATUTES

18 U.S.C. § 1957 ............................................................................................................................ 4

18 U.S.C. § 3553 .......................................................................................................................... 11

18 U.S.C. § 3663A ....................................................................................................................... 15

18 U.S.C. § 3664 .......................................................................................................................... 15

### SENTENCING GUIDELINES

U.S.S.G. § 1B1.3 ................................................................................................................. 8, 9, 10

U.S.S.G. § 2B1.1 ....................................................................................................................... 3, 4

U.S.S.G. § 3B1.3 ................................................................................................................. 4, 6, 7

U.S.S.G. § 4C1.1 ......................................................................................................................... 10

U.S.S.G. § 2S1.1 ............................................................................................................................ 4

### OTHER AUTHORITIES

1984 U.S.C.C.A.N. 3182 ............................................................................................................. 14

## I. INTRODUCTION

The defendant Ramesh Nathan carried out a multi-year fraud to steal from investors, including his uncle and military veterans. He told audacious lies to build credibility with investors, *e.g.*, that he held two Ph.D. degrees from Caltech, he was a billionaire, and that he ran two successful technology companies that provided everything from tennis professional services to space travel technologies. It was all a lie. Additionally, he has shown no remorse and even blamed one of his victims, Mr. Robert Garcia, for the entire scheme at trial. Between his two fraudulent technology companies, which he claimed merged, Nathan scammed investors out of approximately $900,000 and spent it all on himself, his girlfriend, and mother. To reflect the seriousness of the offense and deter future fraudulent conduct by Nathan and others, the government respectfully recommends a Guidelines sentence of 78 months of imprisonment to be followed by three years of supervised release with special conditions, restitution order of $906,206.27, and a mandatory special assessment of $800.

## II. FACTUAL BASES[1]

From approximately January 2016 through August 2017, Nathan knowingly defrauded investors in his company, Relativity Research Fund, Inc. ("Relativity"). PSR ¶ 6. Through this business, Nathan made false statements and material misrepresentations to investors about the company's size, revenues, profit, capitalization, a future Nasdaq Private Market listing, and spending of investor funds. *Id*. To execute the scheme, Nathan hired Mr. Garcia, a Marine veteran and Nathan's former bodyguard, to recruit investors to Relativity. *Id*.

In reality, Relativity did not have any revenue, profits, technology, or business operations. *Id*. ¶ 7. Victims discovered the fraud once Relativity failed to list on the Nasdaq Private Market as Nathan promised. *Id*. Instead, Nathan spent investor funds on frequent travel, personal expenses, and supporting his mother and girlfriend. *Id*. Nathan defrauded 58 victims who invested in Relativity for a total of $307,227.72. *Id*. ¶ 22.

Nathan's scheme did not begin in 2016. He concocted a prior and similar fraudulent technology business—BaselineAgent—three years earlier that he later claimed merged with Relativity. *Id*. ¶ 8.

---

[1] The facts summarized herein are included in the Presentence Investigation Report ("PSR"). Dkt. 231.

Nathan's claims about BaselineAgent mirrored those he made about Relativity: tremendous profits, cutting edge technology, and an upcoming listing on Nasdaq. *Id.* ¶ 9. He made those claims via BaselineAgent's website, press releases, and in direct communications with investors. *Id.* Nathan swindled his own uncle, Hariharan Lingham, who invested $609,900 in BaselineAgent in June 2013. *Id.* Mr. Lingham's investment represented nearly all of his retirement savings. *Id.* That same month, Nathan hired Mr. Garcia as his bodyguard. *Id.* ¶ 10. At the time, Nathan lived in a large, secluded mansion in Rancho Santa Fe, California, and drove luxury vehicles including a Ferrari and two Mercedes. *Id.*; *see* Dkt. 221 at 72-79. Nathan claimed to be a billionaire who had two Ph.D. degrees from Caltech. PSR ¶ 10; Dkt. 221 at 56. At trial, Mr. Garcia recalled reading an article framed in Nathan's office with claims that Nathan was a billionaire genius comparable to Tony Stark. *See* Dkts. 212-26, 221 at 72-79. At the end of 2013, Nathan fired Mr. Garcia, but the two remained in touch as friends. PSR ¶ 10.

By November 2013, Mr. Lingham had become suspicious that BaselineAgent was not a legitimate company, so he hired a lawyer to demand repayment. *Id.* ¶ 11. Mr. Lingham had one meeting with Nathan in January 2014, which spurred Nathan to make some minor repayments. *Id.* A couple months later, Mr. Lingham stopped receiving payments and did not receive any further communications from Nathan about BaselineAgent. *Id.* Mr. Lingham filed a civil lawsuit in California state court and successfully obtained a default judgment against Nathan. *Id.* His investment in BaselineAgent resulted in the loss of nearly all his retirement savings. *Id.* ¶ 9.

Then in June 2016, Nathan told Mr. Garcia that he wanted to rebrand his company, BaselineAgent, into Relativity, which would focus on space travel technologies. *Id.* ¶ 12; *see* Dkt. 221 at 19-20. Nathan offered to make Mr. Garcia a co-founder and chief operating officer. PSR ¶ 12. Mr. Garcia had no relevant experience, but Nathan assured him that he would train Mr. Garcia. *Id.* Nathan just needed someone he could trust. Dkt. 221 at 23. Mr. Garcia accepted the offer and became Relativity's first investor. PSR ¶¶ 12-13. In total, Mr. Garcia invested $18,600. *Id.* at ¶ 13.

By fall 2016, Mr. Garcia had recruited 40 to 50 of his fellow veterans, colleagues, and friends to invest in Relativity at Nathan's direction. *Id.* ¶ 16. He told them about Relativity's technologies and Nathan's background and success with BaselineAgent. *Id.* If individuals were interested, Mr. Garcia

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC                                                    2

would send them a private placement memorandum with details about the company and share subscription forms and direct them to the Relativity website. *Id*. When investors had questions or concerns, Mr. Garcia forwarded them to Nathan and other alleged employees of Relativity; employees that Mr. Garcia never met or even spoke to including the Chief Legal Officer, "Barry Goldberg." *Id*.; Dkt. 221 at 71. None of these employees existed, but were instead fake identities created by Nathan. Through Mr. Garcia, Nathan was able to convince dozens of investors, some of whom invested multiple times, to invest hundreds of thousands of dollars for over a year.

Nathan's scam was finally exposed in August 2017 when a promised Nasdaq Private Market listing for Relativity did not occur. *Id*. ¶ 22. Victims contacted Nasdaq when they were not able to trade the Relativity shares they had purchased. *Id*. Nasdaq informed the investors that they had no relationship with Relativity. *Id*. Instead of using victims' money to develop a company, Nathan used their money to fund his frequent travel, family support, and personal expenses. *Id*. ¶ 21. None of the victims recovered their investment.

At trial, the jury convicted Nathan on all eight counts charged in the Indictment, including six counts of wire fraud and two counts of money laundering. Dkt. 204.

### III.     GOVERNMENT'S GUIDELINES CALCULATION

The Court should adopt the Sentencing Guidelines' calculation set forth below. The money laundering guideline requires first calculating the wire fraud offense level, as described below.

**Wire Fraud, U.S.S.G. § 2B1.1[2]**

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. §2B1.1(a): | 7 |
| b. | Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(1)(H):<br>(loss more than $550,000 but less than $1.5 million) | +14 |
| c. | Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(2)(A)(i),(iii):<br>(more than 10 victims; substantial financial hardship) | +2 |
| d. | Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(10)(C)<br>(sophisticated means) | +2 |
| e. | § 2B1.1 Offense Level | 25 |

---

[2] The government is not seeking the two-level enhancement under U.S.S.G §2B1.1(b)(11)(C)(i) for engaging in unauthorized use of means of identification to obtain any other means of identification.

**Money Laundering, U.S.S.G. § 2S1.1**

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. § 2S1.1: | 25 |
| b. | Specific Offense Characteristics, U.S.S.G. § 2S1.1(b)(2)(A) (Defendant convicted under 18 U.S.C. § 1957) | +1 |
| c. | Adjustment for Abuse of Position of Trust, § 3B1.3 | +2 |
| d. | Total Offense Level: | 28 |

This calculation is consistent with the PSR with two exceptions—the sophisticated means enhancement and abuse of position of trust adjustment, both of which apply in this case. The government agrees with Probation that Nathan's criminal history category ("CHC") is I. PSR ¶ 48. The Total Offense Level 28 at CHC I yields a Guidelines range of 78 to 97 months.

**A. Nathan Used Sophisticated Means to Defraud His Victims**

The Court should apply the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10). The Guidelines provide for a two-level increase if "the offense [] involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10). Not every step of a defendant's conduct needs to be elaborate for the sophisticated means enhancement to apply. It is the totality of the scheme, not any step by itself, that is determinative. *See United States v. Aguare*, 800 F.3d 1173, 1175 (9th Cir. 2015).

Moreover, "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013) (applying enhancement where defendant concealed income by using bank account with deceptive name). For example, the Ninth Circuit affirmed the enhancement where a defendant fraudulently obtained loans and covered up the scheme by manipulating others to lie for him, transferring funds between accounts, and fabricating numerous documents. *United States v. Horob,* 735 F.3d 866, 872 (9th Cir. 2013) (fact that defendant manipulated others to lie for him was probative in upholding the sophisticated means enhancement); *see also United States v. Tanke*, 743 F.3d 1296, 1307-08 (9th Cir. 2014) (enhancement applied where defendant created at least six false invoices and falsified checks on at least ten occasions); *United States v. Rubio*, 579 F. App'x 609, 610 (9th Cir. 2014) (upholding enhancement where defendant "played a supervisory role in a scheme").

1    Nathan's scheme was complex. First, Nathan created multiple fake documents to establish and further his fraud scheme. That included investment documents that appeared to be legitimate, *e.g.*, an 11-page prospectus informing potential investors about Relativity's business and the issuance of shares. Dkt. 210-1 (Tr. Ex. 2). Nathan also drafted and issued fake stock purchase agreements and stock certificates to investors. PSR ¶ 19; Dkts. 210-2, 210-39 (Tr. Exs. 3, 90). Second, Nathan made a professional website that hosted ghostwritten press releases, lengthy financial statements boasting profits rivaling tech giants like Apple, information about office locations worldwide, board members and executives, and videos about Relativity's mission and technology. Dkt. 210-3 (Tr. Ex. 27). Third, Nathan created a false court document to mollify investors who discovered a civil fraud lawsuit against Nathan. PSR ¶ 18; Dkt. 221 at 95. Fourth, Nathan emailed newsletters with false representations about the company's success to investors regularly (and at increased frequency near the end of the scheme) to keep investors hooked and solicit additional investments from victims. Dkts. 210-28, 210-31, 210-33 through 210-37 (Tr. Exs. 70, 73, 77-84). Finally, he used a number of services to make Relativity appear legitimate. For example, renting a virtual office in San Francisco to list on Relativity's website, in communications with investors, and register bank accounts. PSR ¶ 14. Fifth, Nathan created a host of fake employees, which included making Relativity email addresses for non-existent employees including "Barry Goldberg," a chief legal officer, and "Michael Silverstein," an investor relations manager, to defraud his investors. Dkts. 210-3, 210-39, 210-64, 210-70, 210-75, 210-79, 212-9 (Tr. Exs. 27, 90, 145, 151, 158, 167, 395). His most prolific alias, "Barry Goldberg," emailed Mr. Garcia and other investors intending to lull suspicious investors and solicit additional investments. "Barry Goldberg" explained away factual inconsistencies or delays in the Nasdaq listing to investors and Mr. Garcia, which facilitated and perpetuated the theft of funds from the victims. Dkts. 210-42, 212-7, 212-10, 212-16 (Tr. Exs. 94, 340, 411, 467).

The Ninth Circuit has upheld application of the sophisticated means enhancement for conduct nearly identical to Nathan's. For example, the enhancement was upheld in a case where a coconspirator presented himself as the defendant's attorney in furtherance of and to conceal a fraudulent scheme. *United States v. Tolbert*, 704 F. App'x 646, 648 (9th Cir. 2017); *see United States v. Milligan*, 77 F.4th 1008, 1014 (D.C. Cir. 2023) (upholding enhancement where defendant impersonated another person via

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC                              5

email in support of fraud scheme). Similarly, in *United States v. Terabelian*, the court held that the defendant's "intentional participation in the scheme to 'use … fictitious entities' is the kind of sophisticated means precisely contemplated by the Guidelines." 105. F.4th 1207, 1220 (9th Cir. 2024); *see United States v. Intrieri*, 594 F. App'x 406, 407 (9th Cir. 2015) (enhancement properly applied where defendant "used multiple aliases and set up fake business to deceive his victims.")

Furthermore, Nathan opened a business bank account in Mr. Garcia's name without his knowledge or consent, which he used to steal victims' money and spend on his personal use. PSR ¶ 15; Dkts. 210-95, 211-21 (Tr. Exs. 191, 231). Nathan also manipulated Mr. Garcia to lie on his behalf for many months, which allowed Nathan to avoid contact with, and eventual blowback from, the victims. Additionally, the length of the fraud (14 months) and the fact that Nathan successfully convinced early investors to reinvest show that the scheme was sufficiently complex and difficult to detect. These acts all fall well within the ambit of the sophisticated means enhancement upheld by the Ninth Circuit. *See Tanke*, 743 F.3d at 1307-08 (defendant "fully engaged in dozens of various acts over a period of over 16 months to execute and conceal" his fraud scheme). Thus, the Court should apply the sophisticated means enhancement.

**B. As the CEO and Mastermind of Relativity, Nathan Abused His Position of Trust**

The Court should likewise apply the abuse of trust victim adjustment under U.S.S.G. § 3B1.3. "If the defendant abused a position of [] private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," a two-level adjustment applies. U.S.S.G. § 3B1.3. The purpose of the adjustment is to appropriately punish defendants who use a position that makes their fraudulent conduct more difficult to detect. *See id.*, cmt. 1. It is reserved for individuals in positions that are given considerable deference and have a substantial amount of discretion to carry out their duties. *See id.* These individuals are usually "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.*

Courts routinely apply this adjustment where defendants abuse trust even if they are acting as an imposter, rather than holding a legitimate position of trust or legitimately possessing a special skill. For example, in *United States v. Stratos*, the Ninth Circuit upheld the adjustment where the defendant pretended to be a wealth manager. 775 F. App'x 352, 353 (9th Cir. 2019). The fact that the defendant

"was not a bona fide wealth manager does not change the analysis, because he was able to execute the fraudulent scheme by feigning expertise in this position of trust." *Id.*; *see also United States v. Groves*, 594 F. App'x 332, 334 (9th Cir. 2014) (U.S.S.G. § 3B1.3 adjustment proper where defendants impersonated investment brokers); *United States v. Barnes*, 125 F.3d 1287, 1292 (9th Cir. 1997) (affirming adjustment where defendant fraudulently impersonated a doctor).

That is because the facts must be viewed from the perspective of the victim. "This adjustment applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." *See* U.S.S.G. § 3B1.3, cmt. 3. It is irrelevant that Nathan was the chief executive officer ("CEO") of a sham company and an imposter. Instead, the Court should evaluate what the victims knew and believed about Nathan when he carried out the fraud. Those victims included the victim investors in Relativity and Mr. Garcia.

From Mr. Garcia's perspective, Nathan was not just his boss as the CEO of Relativity, but also the billionaire entrepreneur and holder of two doctorate degrees. PSR ¶ 10; Dkt. 221 at 55. In addition to his business acumen and advanced degrees, Nathan manipulated Mr. Garcia by using their years-long friendship to take advantage of the trust that they had built. Other victims testified at trial that they understood Nathan was the CEO, a successful businessman with a track record from BaselineAgent. PSR ¶ 20. As a result, they believed Relativity was not only a real company but a successful one, and that with Nathan at the helm the business would flourish.

Moreover, by virtue of being the CEO and only beneficiary of Relativity, Nathan was not subject to any oversight. "The 'decisive factor' in determining whether a defendant occupied a position of trust is 'the presence or lack of professional or managerial discretion.'" *United States v. Tat*, 97 F.4th 1155, 1164 (9th Cir. 2024). As CEO, Nathan plainly held a position of trust relative to his victims. Indeed, this position of trust significantly facilitated Nathan's commission of the fraud for over a year, despite him making no payments to victims and repeatedly postponing the date that investors could trade their shares on Nasdaq.[3] Thus, the Court should apply the abuse of trust adjustment.

---

[3] The Guidelines further state that this adjustment shall apply where a defendant exceeds or abuses the authority of his position to use without authority any means of identification. *See* U.S.S.G. § 3B1.3, cmt. 2(B). Here, Nathan used his position as Mr. Garcia's employer to obtain Mr. Garcia's

### C. Government's Responses to Defense's PSR Objections

As explained above, the government agrees with Probation that: (i) the loss amount is more than $550,000 but less than $1.5 million; and (ii) Nathan's conduct caused harm to more than 10 victims and substantial financial hardship. *See* PSR ¶ 35. Defense counsel has raised objections on these enhancements. The government addresses each in turn.[4]

#### 1. Nathan Caused an Actual Loss of Approximately $900,000

The Court should reject defense's objection to the PSR's correctly calculated total loss amount of $906,206. This amount represents the $609,900 investment by Hariharan Lingham (less qualifying repayments) in BaselineAgent and the $307,227 invested by the 58 victims of Nathan's Relativity scam.[5] PSR ¶ 23. Defense contends that the Court should not include any losses from the BaselineAgent scheme.

It is well-established that losses suffered by victims who invested in the same fraud scheme, even if not charged, are relevant conduct under the Guidelines. "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable sentencing range." U.S.S.G. § 1B1.3 Background; *see also United States v. Lawrence*, 189 F.3d 838, 844-45 (9th Cir. 1999). The acts must merely be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id*. at 844; *see also* U.S.S.G. § 1B1.3 cmt. 5(B)(i). "The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." *Lawrence*, 189 F.3d at 844 (citing *United States v. Fine*, 975 F.2d 596, 599-600 (9th Cir. 1992) ("[C]onduct which was part of the scheme is counted, even though the defendant was not convicted of crimes based upon the related conduct.")).

---

personal identifying information, including his social security number and passport, and then opened a bank account in Mr. Garcia's name without Mr. Garcia's knowledge or consent.

[4] Defense argues that Nathan should receive credit for acceptance of responsibility under U.S.S.G. § 3E1.1(b), despite denying his guilt and blaming a victim for his entire fraudulent scheme at trial. His argument relies on a non-precedential case from the Southern District of New York. There is no Ninth Circuit authority supporting Nathan's argument.

[5] Defense does not dispute that the loss amount for the Relativity scheme was greater than $250,000.

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC                                    8

Here, the Court correctly ruled that "[t]he evidence at trial showed that the BaselineAgent scheme was 'inextricably intertwined' with the Relativity Research scheme and that the evidence was necessary for the government to tell a '"coherent and comprehensible story regarding the commission of the crime."'" Dkt. 230 (citation omitted).  In other words, the BaselineAgent scheme was "substantially connected" to the Relativity scheme and thus Mr. Lingham's loss is relevant conduct under U.S.S.G. § 1B1.3.

"For instance, Relativity Research said in a press release that it was merging with BaselineAgent, and several victim investors testified that they were aware of that merger." Dkt. 230.  "[Mr.] Garcia also testified that Nathan told him BaselineAgent would invest in Relativity Research and that purported investment is one reason Garcia continued to believe in Relativity Research's potential success." *Id.*  "And many of the Relativity-related documentary evidence, like Garcia's employment contract and Nathan's emails, used a BaselineAgent letterhead or email signature." *Id.*

Additionally, Nathan deployed strikingly similar tactics to perpetrate the BaselineAgent and Relativity schemes.  The similarities include: (1) claiming enormous profits rivaling tech companies like Apple; (2) press releases with false claims about the business' success; and (3) an upcoming listing on Nasdaq that would result in huge returns to early investors. PSR ¶ 9.  At trial, Mr. Lingham testified, and documents corroborated, that Nathan made these false representations to entice Mr. Lingham to invest.  Dkt. 220 at 7-23.  Once Mr. Lingham questioned the investment, Nathan stalled with minimal repayments and failed to appear at trial in the civil lawsuit that Mr. Lingham filed, which resulted in a default judgment. PSR ¶ 11.  Accordingly, the total loss from the BaselineAgent scheme is $598,979.[6]

### 2. Nathan Defrauded 58 Victims and Caused Substantial Financial Hardship to Mr. Lingham

Defense also objects to Probation's application of U.S.S.G. §2B1.1(b)(2)(A), which requires a two-level increase if the offense "involved 10 or more victims" *or* "resulted in substantial financial hardship to one or more victims."  Both apply here, and defense contests the application of the latter.

---

[6] The government notes that Mr. Lingham's $609,900 loss is offset by repayments he received in 2013—$10,921 total—prior to detection of the fraud.  *See* U.S.S.G § 2B1.1 cmt. 3(D); *see also United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998); *United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir. 1998).  The fraud had been detected by November 2013, when Mr. Lingham's attorney sent a letter to Nathan demanding return of his investment.

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC                                         9

First, there are 58 victim investors in the Relativity scheme. PSR ¶ 22.

Second, Nathan caused Mr. Lingham to suffer substantial financial hardship due to the BaselineAgent scheme. Mr. Lingham has repeatedly stated that he lost nearly all of his life's savings due to the scheme. PSR ¶ 9; *see also* Dkt. 220 at 23, 26. The Guidelines provide "suffering substantial loss of a retirement, education, or other savings or investment fund" as a factor that courts should consider in determining whether the adjustment applies. *See* U.S.S.G. § 2B1.1(b)(2)(A)(iii), cmt. 4(F)(iii). Whether the financial harm is substantial is relative to the victim and highly fact specific. *See United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) (victims lost their homes, filed for bankruptcy, or borrowed money to avoid foreclosure, or paid additional fines or penalties); *United States v. Stratos*, 775 F. App'x 352, 353 (9th Cir. 2019) (victims lost their retirement funds and some had to delay retirement); *see also United States v. Chung*, No. 19-CR-00302-JSW-1, 2024 WL 4609597, at *3 (N.D. Cal. Oct. 29, 2024) (victims lost their savings).

Mr. Lingham was 63 years old when he invested his life savings into BaselineAgent. He was on a path of retiring comfortably from the savings he earned over his life. By wiping out his savings at 63 years old, there was little chance he could recoup those funds through his labor. In fact, Mr. Lingham stated that he is going to sell his home and leave California to live more humbly. PSR ¶ 24. He is martialing the remaining asset he has to support himself and his wife through their last years. Mr. Lingham will be living a different life than the one he worked and planned for due to investing in Nathan's BaselineAgent scheme.

### 3. Nathan is Not a Zero-Point Offender

Finally, contrary to defense's assertion, Nathan is not a zero-point offender because he caused substantial financial hardship. *See* U.S.S.G. § 4C1.1(a)(6). Here, as explained above, Nathan personally caused substantial financial hardship to Mr. Lingham as he lost nearly all his retirement savings. *See supra* at 9-10. The fact that Mr. Lingham is not a statutory victim is of no consequence. Courts have held that any person who sustained any part of the actual loss determined under subsection (b)(1) is a victim under the Guidelines. *See United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008). As discussed above, the BaselineAgent scheme is relevant conduct, and therefore Mr. Lingham's financial loss is included under U.S.S.G. § 1B1.3.

## IV. GOVERNMENT'S SENTENCING RECOMMENDATION

At sentencing, the overarching goal is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; [and] to protect the public . . . ." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (en banc); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). As set forth by Congress, the Court's objective is to "impose a sentence sufficient, but not greater than necessary." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citation omitted).

To reflect the seriousness of the offense and deter future fraudulent conduct by Nathan, the government recommends a Guidelines sentence of 78 months imprisonment, followed by a term of three years of supervised release to enforce payment of the restitution order, to make victims whole, and to assist Nathan in obtaining stable employment. There are no mitigating facts that would favor a downward variance from the Guidelines range. While Nathan has no criminal history, that is simply because this is the first time he was caught. The Relativity scheme was not a one-time lapse in judgment by Nathan. He defrauded his uncle and then continued that scheme to steal from innocent victims, including U.S. military veterans. Accordingly, a Guidelines sentence is necessary to achieve the goals of sentencing under 18 U.S.C. § 3553.

### A. The Nature and Circumstances of Nathan's Offense

Nathan carried out an intricate fraud scheme for over a year attracting and reloading victims by making false and misleading statements about himself, Relativity, and the ever-moving target of a "listing" on Nasdaq Private Market. He posed as other "employees" via company email accounts to entice investors and lull them into inaction when they suspected something was awry. Nathan used Mr. Garcia, a trusted friend (or so Mr. Garcia thought) to solicit investors. Many of those investors were Mr. Garcia's fellow service members and veterans. Moreover, Nathan attracted investors to Relativity, in part, on the false premise that Nathan ran a successful technology company, BaselineAgent, and that the two companies would merge. BaselineAgent, however, was nothing more than a rouse to steal more than half a million dollars from his uncle and Relativity was merely a continuation of that scheme.

Nathan weaved an intricate web of lies that convinced inexperienced investors to trust him, a purportedly highly educated billionaire experienced in founding lucrative technology companies. Nathan made investors believe they were getting in on the ground floor of a cutting-edge space technology company like SpaceX and Blue Origin. He also used the good reputation of Nasdaq to entice investors and bolster Relativity. It worked, and Nathan caused real harm to military veterans, the elderly, and working-class men and women. Several investors described how Nathan's fraudulent scheme impacted them in written statements made to the Court. Mr. Lingham reported that Nathan's scheme has caused him to feel anger, grief, and depression and he also experienced insomnia, nightmares, and trouble concentrating because of Nathan's conduct. PSR ¶ 24. Mr. Lingham added that these events have made him "more cautious with [his] spending . . . . It [] made it difficult [] to spend on important things." *Id*. Mr. Lingham stated that instead of living out the retirement he worked and planned for, he and his wife are living "without any pension and with insufficient Social Security benefits to account for monthly expenses [and] to continue living in southern California is a daily struggle. Because of this financial loss, we have decided to sell our current home . . . [to move] to a different state to downsize and live humbly." *Id*. Mr. Lingham explained that the BaselineAgent scam has made him suspicious of everyone. *See* Lingham's victim impact statement ("VIS") at 5.

Mr. Garcia wrote "I lost a lot of friendships over this. I lost people I really cared about;" and "It impacted my relationship with my son because I felt I couldn't provide as a best as I could." PSR ¶ 25. Mr. Garcia also explained that he required mental health treatment and even experienced threats to his life because of Nathan and the Relativity scheme. *See* Garcia's VIS at 1-2. Another victim wrote "[b]eing a victim is a terrible feeling . . . . I absolutely took all the money I could afford to invest in Relativity . . . . I definitely would like my money back. Times were hard then and they are much harder now." PSR ¶ 26. Mr. Synclair, a victim who testified at trial, wrote "[t]his situation not only negatively impacts my wife and I, but many servicemen, women, and veterans as well." *Id*. ¶ 27. Finally, Ms. Gunter, who also testified at trial, stated "[t]he experience brought emotional strain, a sense of violation, and years without resolution." *Id*. ¶ 29. She added that the process of reporting, testifying, and helping ensure accountability required significant time and commitment. The weight of this case has been stressful, and the mental toll should not be overlooked." *Id*. Nathan caused genuine suffering to his

victims, and the sentence should meaningfully reflect that harm.

The Court should also consider the brazenness of Nathan's fraud scheme in imposing a sentence. His lies were audacious, he used a middleman to do his dirty work, he stole from honorable people of modest means, and he did not take any meaningful steps toward developing a legitimate business.

### B. Nathan's History and Characteristics

Nathan reported having a normal upbringing. In fact, he pursued a career as a tennis professional, which undoubtedly required a significant investment of time and money. He also reports being a software developer, presumably capable of, and currently is, earning an income therefrom. Nathan did not report experiencing a difficult childhood, and he has no history of mental illness and no issues with alcohol or substance abuse. While he has no criminal history, Relativity was not his first fraud; merely a continuation of his BaselineAgent scheme where he defrauded his elderly uncle. Instead of using his skills as a tennis player or a software developer to earn an income, he chose to steal money from his family, veterans, and working-class people. Finally, Nathan has not expressed any remorse or taken any responsibility for his actions.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

The Court should impose a substantial custodial sentence to deter Nathan and others contemplating fraudulent conduct, and to assure his victims and the community, that financial fraud is serious and will be punished accordingly. Statements from the victims provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law. One elderly victim urged the Court to "[p]ut a stop to this," noting that it is "a sad state of affairs to take advantage of people in the military who just want to get ahead for their famil[ies]." PSR ¶ 28.

In his statement, Mr. Garcia wrote, "I have no doubt he did something similar before . . . and will continue to do it to others." *See* Garcia's VIS at 2. Mr. Lingham made it clear that Nathan did do something similar before, the BaselineAgent scheme; and Nathan skirted liability for that scam by moving to India avoiding the civil lawsuit brought by Mr. Lingham. *See* Lingham's VIS at 5. Nathan went on to defraud many with the Relativity scheme. Mr. Lingham stated, "[Nathan] is definitely a threat to the community unless he []is punished." *Id.*

Too often perpetrators of financial crimes are given inordinately lenient sentences compared to other criminal offenses. While not violent in nature, the suffering by Nathan's victims is real. As the Court may recall during jury selection many prospective jurors identified as victims, or knew victims, of fraud; and some reported being so deeply impacted by the experience that they could not be impartial. The Court has an opportunity to send a message that committing fraud does not pay because there will be certain and serious consequences.

### D. The Need to Afford Adequate Deterrence and Protect the Public from Future Crimes by Nathan

The need for general deterrence is paramount in this case. Economic crimes like Nathan's are deterrable so long as they are met with a commensurate term of imprisonment. In drafting § 3553, Congress specifically confirmed that "[t]o deter others from committing the offense . . . is particularly important in the area of white collar crime." S. Rep. No. 98-255, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. Congress was specifically concerned with the fact that "white collar criminals often are sentenced to . . . little or no imprisonment," which the offenders disregard as "a cost of doing business." *Id*.

The profile of white-collar criminals also demonstrates the increased value of general deterrence. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).

### E. The Need to Avoid Unwarranted Sentencing Disparities

The government is recommending a sentence at the low end of the Guidelines range. The Guidelines were themselves intended to avoid sentencing disparities. As discussed herein, there are no mitigating facts to justify a downward variance, and Nathan's conduct showed an especially callous approach by defrauding his family and veterans. Accordingly, a low-end Guidelines sentence of 78-months imprisonment is necessary and sufficient to serve the goals of sentencing as described in 18 U.S.C. § 3553(a).

//

//

UNITED STATES' SENTENCING MEMORANDUM
19-CR-0034 VC                                                                 14

## V. RESTITUTION AND FINE

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id*. § 3663A(a)(2). The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim. *Id*. § 3663A(b)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id*. § 3664(f)(1)(A). Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. *Id*. § 3664(e).

Restitution is mandatory for the victims of the Relativity fraud scheme. Here, the preponderance of evidence shows that the amount due to victims is $307,227.72. PSR ¶ 23. This amount was foreseeable by Nathan. Additionally, restitution should be awarded to Mr. Lingham for the financial loss associated with BaselineAgent fraud scheme as relevant conduct. *See* 18 U.S.C. § 3663A. The amount due to Mr. Lingham is $588,058, representing the total payment from Mr. Lingham to Nathan for BaselineAgent less the repayments Nathan made to Mr. Lingham in 2013 and 2014. PSR ¶ 23.

The Court should order restitution as required by the MVRA. Alternatively, if the Court determines that the victims' losses are not fully ascertainable at this time, the Government requests that the Court postpone a final determination of the restitution amount for 90 days. *See* 18 U.S.C. § 3664(d)(5).

The government defers to the Court regarding whether to impose a fine, but the Court should consider that Nathan reported inheriting $350,000 from his father's estate and earning $120,000 annually. PSR ¶ 66.

## VI. CONCLUSION

Nathan harmed dozens of investors including his own family and veterans. The government respectfully requests that the Court impose a sentence that accounts for his misdeeds and deters him and others like him from engaging in similar conduct. For the foregoing reasons, a sentence of 78 months

imprisonment appropriately reflects the serious of the offense, promotes respect for the law, and serves as just punishment to deter defendant and protect others from future fraudulent schemes devised by Nathan.

DATED: November 5, 2025               Respectfully submitted,

                                                                                    CRAIG H. MISSAKIAN
                                                                                    United States Attorney

                                                                                                 */s/*
                                                                                   SARA E. HENDERSON
                                                                                   ROLAND CHANG
                                                                                   Assistant United States Attorneys