JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
GABRIELA BISCHOF, Bar No. 272973
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:    (510) 637-3500
Facsimile:    (510) 637-3507
Email:        Gabriela_Bischof@fd.org


Counsel for Defendant Nathan


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19–34 VC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | **Court:**        Courtroom 4, 17th Floor |
| RAMESH NATHAN, | **Hearing Date:** November 12, 2025 |
| Defendant. | **Hearing Time:** 1:00 p.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... **ii**

**INTRODUCTION** ................................................................................................................. 1

ARGUMENT ........................................................................................................................... 1

    I.     Mr. Nathan's Guideline Calculation ................................................................. 2

    II.    Objections to the PSR's Sentencing Guidelines Calculation ............................ 2

        A.     Mr. Lingham's alleged loss should not be included in the loss amount. .............. 2

            1.    Mr. Lingham's loss was not caused by the offense. ................................. 3

            2.    The alleged Baseline Agent scheme was separate from the Relativity scheme and does not constitute relevant conduct. .................................... 4

            3.    There is insufficient evidence that Baseline Agent was a fraud. .............. 6

        B.     The substantial financial hardship enhancement does not apply, and a deduction for 0-point offender is therefore applicable. .......................................................... 7

        C.     Mr. Nathan should receive a partial acceptance of responsibility adjustment...... 9

    III.   Objections to the PSR's findings of fact. ........................................................ 10

    IV.   Response to the government's objections. ...................................................... 10

        A.     The sophisticated means enhancement does not apply. .................................... 10

        B.     The abuse of a position of trust enhancement does not apply. .......................... 12

    V.    A 24-Month sentence is appropriate based on the section 3553(a) Factors. ................. 14

        A.     A below-Guidelines sentence is appropriate in this case. .................................. 14

        B.     Additionally, a below-Guidelines sentence is necessary because the Guidelines loss enhancements overpunish defendants like Mr. Nathan. ............................. 16

        C.     The additional enhancements urged by the government are unfairly cumulative. .................................................................................................................... 18

    VI.   Restitution ....................................................................................................... 19

    VII.  Supervised Release ........................................................................................ 20

**CONCLUSION** .................................................................................................................... 21

1

## TABLE OF AUTHORITIES

2

**Federal Cases**                                                   **Page(s)**

3

*Kimbrough v. United States,*
   552 U.S. 85 (2007) ............................................................................................ 16

4

*Stephens v. Union Pac. R.R. Co.,*
   935 F.3d 852 (9th Cir. 2019) ............................................................................. 3

5

6

*United States v. Adelson,*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................. 15, 17, 18

7

*United States v. Aderinoye,*
   33 F.4th 751 (5th Cir. 2022) ............................................................................. 11

8

9

*United States v. Armstead,*
   552 F.3d 769 (9th Cir. 2008) ............................................................................. 4

10

*United States v. Barnes,*
   125 F.3d 1287 (9th Cir. 1997) ......................................................................... 12

11

*United States v. Bussell,*
   504 F.3d 956 (9th Cir. 2007) ........................................................................... 19

12

13

*United States v. Carty,*
   520 F.3d 984 (9th Cir. 2008) ........................................................................... 14

14

*United States v. Constantinescu,*
   147 F.4th 299 (2d Cir. 2025) ........................................................................... 11

15

16

*United States v. Dickler,*
   64 F.3d 818 (3d Cir. 1995) ............................................................................... 6

17

*United States v. Doe,*
   705 F.3d 1134 (9th Cir. 2013) ......................................................................... 10

18

*United States v. Dove,*
   247 F.3d 152 (4th Cir. 2001) ............................................................................. 6

19

20

*United States v. Eyraud,*
   809 F.3d 462 (9th Cir. 2015) ........................................................................... 19

21

*United States v. George,*
   949 F.3d 1181 (9th Cir. 2020) ........................................................................... 9

22

*United States v. Gossi,*
   608 F.3d 574 (9th Cir. 2010) ........................................................................... 19

23

24

*United States v. Griffith,*
   584 F.3d 1004 (10th Cir. 2009) ..................................................................... 6, 7

25

*United States v. Groves,*
   594 F. App'x 332 (9th Cir. 2015) .................................................................... 12

26

*United States v. Guldi,*
   141 F.4th 435 (2d Cir. 2025) ........................................................................... 11

27

*United States v. Gupta,*

28

904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................... 16, 17

*United States v. Hicks*,
217 F.3d 1038 (9th Cir. 2000) ................................................................ 9

*United States v. Hill*,
No. 13-cr-00765-SI-1, 2015 WL 1055891 (N.D. Cal. Mar. 10, 2015) ........................... 6

*United States v. Horob*,
735 F.3d 866 (9th Cir. 2013) ................................................................ 11

*United States v. Houston*,
217 F.3d 1204 (9th Cir. 2000) ............................................................... 10

*United States v. Huggins*,
844 F.3d 118 (2d Cir. 2016) ................................................................. 12, 13

*United States v. Jolly*,
102 F.3d 46 (2d Cir. 1996) .................................................................. 12, 13

*United States v. Luna*,
21 F.3d 874 (9th Cir. 1994) ................................................................. 5

*United States v. Peterson*,
101 F.3d 375 (5th Cir. 1996) ................................................................ 6

*United States v. Randall*,
157 F.3d 328 (5th Cir. 1998) ................................................................ 6

*United States v. Schaefer*,
291 F.3d 932 (7th Cir. 2002) ................................................................ 6

*United States v. Sheahan*,
31 F.3d 595 (8th Cir. 1994) ................................................................. 6

*United States v. Sorensen*,
148 F.4th 992 (8th Cir. 2025) ............................................................... 11

*United States v. Stratos*,
775 F. App'x 352 (9th Cir. 2019) ............................................................ 12

*United States v. Tat*,
97 F.4th 1155 (9th Cir. 2024) ............................................................... 12

*United States v. Tavberidze*,
No. 23-cr-585-03 (JSR), 2025 WL 748354 (S.D.N.Y. Mar. 10, 2025) ............................ 9

*United States v. Terabelian*,
105 F.4th 1207 (9th Cir. 2024) .............................................................. 11

*United States v. Thomsen*,
830 F.3d 1049 (9th Cir. 2016) ............................................................... 19

**Federal Statutes**

18 U.S.C. § 1343 ........................................................................... 1

18 U.S.C. § 1957 ........................................................................... 1, 2

18 U.S.C. § 3553(a) ........................................................................................ *passim*

18 U.S.C. § 3583(c) ............................................................................................... 20

18 U.S.C. § 3663A ................................................................................................. 19

18 U.S.C. § 3664 ................................................................................................... 19

**Sentencing Guidelines**

U.S.S.G. § 1B1.3 ........................................................................................... 3, 4, 6

U.S.S.G. § 2B1.1 ........................................................................................... *passim*

U.S.S.G. § 2F1.1 ..................................................................................................... 6

U.S.S.G. § 2S1.1 ..................................................................................................... 2

U.S.S.G. § 3B1.3 ......................................................................................... 10, 12, 13

U.S.S.G. § 3E1.1 ................................................................................................. 2, 9

U.S.S.G. § 4C1.1 ............................................................................................. 2, 7, 9

U.S.S.G. § 5D1.1 ................................................................................................... 20

U.S.S.G. § 5D1.2 ................................................................................................... 20

U.S.S.G. § 6A1.3 ..................................................................................................... 8

Insert Lexis Table of Authorities here.

**INTRODUCTION**

We begin by acknowledging the serious challenges that Mr. Nathan must confront. Mr. Nathan exercised his right to test the government's proof at trial and was convicted on six counts of wire fraud, 18 U.S.C. § 1343, and two counts of money laundering, 18 U.S.C. § 1957. Multiple witnesses testified to having invested their money in Relativity, and losing their investment. The Sentencing Guidelines, based on a contested loss amount of over $600,000, in combination with additional offense conduct factors urged by the government, could result in a Guidelines range as high as 78-97 months. Based on a superficial review of just these facts, a sentencing court might be inclined to impose a sentence within the advisory Guidelines range.

The defense urges this Court to look deeper and to consider all of the 18 U.S.C. § 3553 factors. We respectfully submit that a careful consideration of the § 3553 factors, especially the need to avoid unwarranted sentencing disparities and the need for adequate general and specific deterrence, counsel in favor of a sentence well below the advisory Guidelines range. In addition to failing to reflect most of the critical § 3553 factors, the Guidelines are not empirically based and grossly exceed § 3553's requirement to impose a sentence that is sufficient, but not greater than necessary.

After considering his background and offense conduct through the lens of relevant statutory factors, Mr. Nathan submits that the appropriate sentence in this case is a period of incarceration of 24 months in custody, followed by 1 year of supervised release, an $800 special assessment, and $307,227.72 in restitution. While Mr. Nathan's conduct in this case was reprehensible, compared to other fraud cases the total loss amount in this case was relatively modest. Additionally, this is Mr. Nathan's first offense. Since Mr. Nathan has never been to prison before, any prison sentence will have an outsized deterrent effect on him. Moreover, imposing a sentence that requires Mr. Nathan to serve more than a year in prison, rather than merely probation, will send a strong deterrent message to other fraud defendants. Finally, this sentence will allow Mr. Nathan the opportunity to work hard to earn money after his release, enabling faster restitution for the victims. For all these reasons, a 24-month sentence is appropriate here.

**ARGUMENT**

Mr. Nathan disagrees with certain Guidelines calculations in the Presentence Report (PSR),

specifically the loss amount, failure to apply the 0-point offender reduction, and failure to reduce the offense level by one point to avoid penalizing Mr. Nathan for exercising his right to a trial.[1] Counsel also understands that the government is seeking additional enhancements not in the final PSR, specifically sophisticated means and abuse of a position of trust enhancements.

Although Probation's calculation results in a total offense level of 24 and a guideline range of 51-63 months, Mr. Nathan argues below that his total offense level is 19, resulting in an advisory guideline range of 30-37 months. A 6-month downward variance to 24-month sentence is appropriate in this case to account for the § 3553(a) factors.

## I.    Mr. Nathan's Guideline Calculation

Base Offense Level, U.S.S.G. §2S1.1(a)(1), § 2B1.1(a)(1).......................................7
Loss Amount, U.S.S.G. § 2B1.1(b)(G) ($307,227.72) .........................................+12
Ten or More Victims, U.S.S.G. § 2B1.1(b)(2)(A) ................................................+2
Conviction under 18 U.S.C. § 1957, U.S.S.G. §2S1.1(b)(2)(A) ...........................+1
0-point Offender, U.S.S.G. § 4C1.1...................................................................... -2
Acceptance of Responsibility, U.S.S.G. § 3E1.1 ...................................................-1

Total Offense Level ...........................................................................19
Criminal History Category ....................................................................I
Guideline Range ......................................................................... 30-37

Mr. Nathan's Request ...............................................................24 months
Probation's Recommendation....................................................40 months

## II.    Objections to the PSR's Sentencing Guidelines Calculation

Mr. Nathan respectfully submits that Probation's Guidelines calculation is incorrect, for three reasons. First, the loss amount incorrectly includes loss claimed by Mr. Nathan's uncle, Hariharan Lingham. This loss should not count towards the loss amount: Mr. Lingham's investment in Baseline Agent was not fraudulently induced, and it is not relevant conduct because the Baseline Agent scheme is not sufficiently connected to the Relativity scheme. Second, the substantial financial hardship enhancement does not apply—and therefore the deduction for 0-point offender does. Third and finally, Mr. Nathan should receive a one-point deduction for acceptance of responsibility.

### A.    Lingham's alleged loss should not be included in the loss amount.

At trial, Mr. Nathan's uncle, Hariharan Lingham, testified that he lost $598,979 he invested in

---

[1] Mr. Nathan preserved these arguments by raising them as Objections to the PSR. For the sake of completeness, the objections are attached as Exhibit A.

1    Mr. Nathan's former company, Baseline Agent, in 2013. Probation has counted this alleged loss as

2    part of the overall loss amount under U.S.S.G. § 2B1.1(b)(1)(H). PSR ¶ 35. But Mr. Lingham's

3    alleged loss is not properly included in the loss amount, for three reasons. First, Mr. Lingham's loss

4    was not caused by the Relativity scheme—on the contrary, it took place years before the charged

5    offense conduct even began. Second, even assuming that there was a scheme to defraud investors in

6    Baseline Agent, any conduct relating to this separate scheme would not constitute relevant conduct

7    for the purposes of sentencing.[2] Third, there is insufficient evidence that Baseline Agent was a fraud,

8    or that Mr. Lingham's investment was obtained through fraudulent means. Thus, the loss amount is

9    the $ 307,227.72 obtained from the Relativity investors and the specific offense characteristic should

10   be under § 2B1.1(b)(1)(G) (+12), not § 2B1.1(b)(1)(H) (+14).

### 1.    Lingham's loss was not caused by the offense.

12       Mr. Lingham's loss cannot be properly counted towards the loss amount because it was not

13   caused by the offense. The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary

14   harm that resulted from the offense."[3] Under this definition, "the offense" must have been the but-for

15   and proximate cause of the loss for it to be counted towards the overall loss amount. U.S.S.G. Reason

16   for Amendment 617 explains that § 2B1.1 "incorporates [a] causation standard that, at a minimum,

17   requires factual causation (often called 'but for' causation) and provides a rule for legal causation."[4]

18       In this case, it cannot be said that the offense—namely, the Relativity scheme—was the "but-

19   for" cause of Mr. Lingham's loss. Mr. Lingham is alleged to have lost $598,979 he invested in

20   Baseline Agent in 2013. His loss was caused by the failure of Baseline Agent and took place years

21   before the Relativity scheme even began. In other words, even if the Relativity scheme had never

22   taken place, Mr. Lingham would still have lost the money he had invested in Baseline Agent. Thus,

23   the Relativity scheme cannot conceivably be deemed a "but-for" cause of Mr. Lingham's loss.[5]

24

25

26   [2] *See* U.S.S.G. § 1B1.3(a)(2).
     [3] U.S.S.G. § 2B1.1(b)(1)(C)(i).
27   [4] Available at:
     https://www.ussc.gov/guidelines/amendment/617#:~:text=These%20sections%20address%20basic%20forms,simple%20property%20damage%20or%20destruction.
28   [5] *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 855 (9th Cir. 2019) (an event is the but-for cause of a harm if the harm would not have happened without said event).

1   Accordingly, Mr. Lingham's loss does not meet the definition of "actual loss" and cannot be counted

2   towards the overall loss amount.

3        **2.**     **The alleged Baseline Agent scheme was separate from the Relativity scheme and does not constitute relevant conduct.**

4        The indictment charged Mr. Nathan with defrauding investors **in Relativity** by making

5   misstatements to induce investments **in Relativity**. *See* Dkt. 1 at ¶¶ 8, 13. Under U.S.S.G.

6   § 1B1.3(a)(2), only actions that are "part of the same course of conduct or common scheme or plan *as*

7   *the offense of conviction*" constitute relevant conduct. Even assuming arguendo that Baseline Agent

8   was a fraud, Mr. Lingham's investment is not properly included in the loss amount because Baseline

9   Agent was a separate scheme.

10       Acts are part of a common scheme or plan if they are "substantially connected to [the offense]

11  by at least one common factor, such as common victims, common accomplices, common purpose, or

12  similar modus operandi."[6] Courts generally require a high degree of interconnection to find that two

13  acts are sufficiently related to constitute part of a common scheme. For instance, in *Armstead*, the

14  defendant was found guilty of a bank fraud conspiracy whereby Armstead and his co-conspirators

15  stole packets of personal information and used them to create false driver's licenses.[7] These drivers'

16  licenses were then used to both withdraw funds from the individuals' bank accounts and to take out

17  unauthorized lines of credit at retail stores and purchase merchandise.[8] The retail fraud was

18  sufficiently related to constitute part of the same scheme as the bank fraud because the retail fraud

19  "involved the same co-conspirators using the same personal identification information that was used

20  to perpetrate the bank fraud" and the retail fraud had a similar modus operandi to the bank fraud: both

21  involved using false drivers' licenses.[9]  Thus, the two offenses were substantially related.

22       Here, however, Baseline Agent and Relativity do not share overlapping timeframes, common

23  victims, common accomplices, common purpose, or sufficiently similar modus operandi to be

24  deemed part of a common scheme or plan.

---

[6] *United States v. Armstead*, 552 F.3d 769, 779 (9th Cir. 2008) (quoting U.S.S.G. § 1B1.3, cmt. n. 5(B)(i)) (quotation marks omitted).

[7] 552 F.3d at 774.

[8] *Id.*

[9] *Id*. at 779.

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

- **Different time frames.** Baseline Agent operated before 2014, whereas Relativity Research was launched years later, in June 2016. Mr. Nathan founded and operated another company (CyberX Gaming) in between those time frames.

- **Different victims.** Investors in the Relativity fraud were veterans recruited by Robert Garcia, whereas the sole identified victim of the Baseline Agent scheme was a family member of Mr. Nathan's.

- **Different participants.** The supposed schemes did not involve a common accomplice, Robert Garcia was involved only in the Relativity Research scheme, not Baseline Agent.

- **Different subject matters and markets.** Baseline Agent and Relativity Research involved totally different subject matter and markets: Baseline Agent was a tennis mobile application, Relativity Research was a space exploration startup.

- **Separate finances.** The companies did not have overlapping finances. Agent Huebsch testified that there was no overlap between the Baseline Agent bank records and the Relativity Research bank records. The Relativity accounts were all opened after the Baseline accounts closed. She did not see a transfer from Baseline into Relativity.[10] The Relativity Research website may have said that it had merged with Baseline Agent, "[h]owever, BaseLine Agent Capital's available bank statements did not support that claim at all."

- **Different modus operandi.** The PSR concludes that the Baseline Agent scheme and the Relativity scheme involved similar modus operandi because, in both cases, Mr. Nathan told investors the company would go public on Nasdaq. PSR ¶ 9. But that is insufficiently specific to constitute a modus operandi.[11] In *Luna,* the Ninth Circuit held that common characteristics of four robberies, such as use of guns, masks, gloves, bags, loud entry, use of profanity and the abuse of bank employees, were too generic to qualify as modus operandi evidence. In this district, a course of conduct in which the "defendant used his gang status to gain access to the victims, and used a firearm and either the threat of force or force to intimidate his victims, while driving in vehicles around the Santa Rosa, California area" was not considered

---

[10] See Trial Ex. 177-010.

[11] *United States v. Luna*, 21 F.3d 874, 878–89 (9th Cir. 1994).

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

sufficiently specific to be a modus operandi.[12] The government has argued that because

Relativity claimed it would merge with Baseline Agent, the two are part of the same common

scheme. Any entrepreneur will use his prior business experience or success to drum up

interest in a current project, but that does not mean that any two endeavors are the same

common scheme simply because they involve the same person committing the same type of

crime. And in any event, the use of a similar modus operandi is not enough to establish a

"common scheme" in light of all the other differences between the Baseline Agent and

Relativity schemes.

### 3.    In the alternative, there is insufficient evidence that Baseline Agent was a fraud.

To constitute relevant conduct under U.S.S.G. § 1B1.3, the conduct must be criminal.[13] Mr.

Lingham's testimony regarding his investment in Baseline Agent was that he invested, became

anxious about the state of the company, and subsequently lied to Mr. Nathan and claimed he had

personal problems and needed his investment returned to him. He received three payments thereafter,

totaling far less than his original investment. Baseline Agent was a company operated by Mr. Nathan

during and prior to 2014.  The government obtained none of Baseline Agent's bank records from the

time it was in operation. This evidence is insufficient to establish that Baseline Agent was a fraud and

that Mr. Lingham was its victim.

At trial, Mr. Lingham testified that after he invested in Baseline, he became suspicious – for

some totally innocuous and some more concrete reasons - that the company was not financially

sound. Dkt. 220, RT 29:6-30:2; 32:14-17; 32:2-11; 47:7-25.  Mr. Lingham met with Mr. Nathan and

demanded his money back. Dkt. 220, RT 35:25-36:18. Mr. Nathan told him the money had already

been invested, but Mr. Lingham lied and claimed he needed the money back because he "had other

---

[12] *United States v. Hill*, No. 13-CR-00765-SI-1, 2015 WL 1055891, at *4 (N.D. Cal. Mar. 10, 2015) (Illston, J.).
[13] *See, e.g., United States v. Dickler*, 64 F.3d 818, 830–31 (3d Cir. 1995); *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001); *United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996) ("[f]or conduct to be considered 'relevant conduct' for the purposes of establishing one[']s offense level[,] that conduct must be criminal.") (determination of loss under § 2F1.1 with respect to conduct under § 1B1.3 (a)(2)); *United States v. Randall*, 157 F.3d 328, 331 (5th Cir. 1998) (same)*; United States v. Schaefer*, 291 F.3d 932, 939 (7th Cir. 2002) ("In short, § 1B1.3(a) explicates the fundamental rule that relevant conduct must be criminal in nature, though subsection (a)(4) indicates that each applicable guideline may also specify additional relevant factors."); *United States v. Sheahan*, 31 F.3d 595, 600 (8th Cir. 1994); *United States v. Griffith*, 584 F.3d 1004, 1013 (10th Cir. 2009) (must constitute criminal offense under federal or state statute).

problems" and could no longer afford to invest it. *Id*. Mr. Nathan told him he would try to get him the money back, either in a lump sum or in installments, and Mr. Lingham said he would think about it. Dkt. 220, RT 36:4-17. He later emailed, asking for a lump sum. Dkt. 220, RT 37:1-4. He received three payments of $4,475 after the meeting. Dkt. 220, RT 37:9-12. Mr. Lingham never received the remainder of the $600,000 he invested. Dkt. 220, RT 38:2-4. Mr. Lingham agreed that it was not realistic to expect money to simply be returned after it's been invested in a company. Dkt. 220, RT 55:6-16. At trial, Agent Huebsch testified that the FBI did not obtain any bank records from 2013, the time of Mr. Lingham's investment into Baseline Agent, and thus the FBI had no way to know whether Baseline Agent was a healthy company in 2013.

In sum, this Court should not allow the government to triple the loss amount based on disputed, unindicted conduct that occurred too remotely for Mr. Nathan to effectively defend himself against it, based on a preponderance of the evidence standard. Under the law, the connection between Baseline Agent and Relativity is far too tenuous to allow the government a free pass on meeting its burden of proof, and the evidence the government procured and presented with regard to Baseline Agent was insufficient to show that the loss of Mr. Lingham's investment was criminal in nature. Accordingly, conduct related to Baseline Agent cannot be considered relevant conduct for purposes of determining the loss amount.

### B. The substantial financial hardship enhancement does not apply, and a deduction for 0-point offender is therefore applicable.

The PSR concludes that a 2-point enhancement applies because, among other reasons, the offense "resulted in substantial financial hardship to one or more victims" under U.S.S.G. § 2B1.1(b)(2)(A)(iii), specifically that Mr. Lingham lost retirement savings.[14] PSR ¶ 35. The enhancement should not be applied in this case because (1) the loss affidavit is insufficient; (2) Mr. Lingham's financial circumstances do not meet the criteria for substantial financial hardship; (3) Mr. Lingham is not a "victim" under the Guidelines' definition; and (4) the Relativity scheme was not the but-for or proximate cause of Mr. Lingham's loss.

---

[14] Mr. Nathan concedes that the 2-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(iii) applies regardless because there were 10 or more victims of the Relativity scheme, but the determination of substantial financial hardship is relevant because it bars him from receiving the reduction for 0-point offender under U.S.S.G. § 4C1.1.

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

7

First, Mr. Lingham's loss affidavit is too summary and too conclusory to meet the requirement that Guidelines calculations be based on information carrying "sufficient indicia of reliability" to support their probable accuracy.[15] Specifically, Mr. Lingham does not provide any documentation supporting his claim that he withdrew the invested funds from his retirement savings.[16]

Second, Mr. Lingham's financial circumstances do not meet the criteria for substantial financial hardship. Mr. Lingham claims to have lost a portion of his retirement savings but does not claim it was a significant portion. Mr. Lingham and his wife have both retired despite the loss of a portion of their savings. Mr. Lingham testified that he retired in 2017, at age 67. Dkt. 220 RT 5:1-3. Mr. Lingham does not claim they had to delay their retirement plans. Mr. Lingham notes that they lack a pension, but this is unrelated to the loss of his investment. When asked whether the crime affected his family's livelihood, Mr. Lingham wrote "No" and stated that his family was "able to overcome the financial loss." Moreover, public records do not support Mr. Lingham's claims that he is selling his house to make additional income to compensate for the loss. According to a Redfin record and Accurint property report, Mr. Lingham's house in Yorba Linda remains under his name and is not up for sale.[17]

Third, even if the loss affidavit is assumed sufficient, the enhancement does not apply to the conduct described because Mr. Lingham does not meet the Guidelines definition of "victim." The enhancement only applies where the offense "resulted in substantial financial hardship to one or more victims."[18] But Mr. Lingham does not meet the definition of "victim." Under the Guidelines Application Notes, that term applies to persons "who sustained any part of the actual loss determined under subsection (b)(1)." *See supra* at II.A.2. The Guidelines further define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."[19] Here, the offense Mr. Nathan was charged and convicted of relates to defrauding investors in Relativity, not Baseline Agent. Mr. Lingham has not identified any losses that he suffered due to the Relativity scheme. Thus,

---

[15] *See* U.S.S.G. § 6A1.3.
[16] *See* Exhibit B, Victim Impact Statement, Redfin and Accurint Reports.
[17] *Id*.
[18] USSG 2B1.1(b)(2)(A)(iii).
[19] U.S.S.G. § 2B1.1(b)(1)(C)(i).

1  he is not a "victim" of the offense at issue here, and the enhancement does not apply.

2  Finally, causation has not been sufficiently established. Under § 2B1.1(b)(2), the enhancement

3  applies only to conduct that "resulted in" substantial financial hardship, language that has been

4  interpreted to require but-for and proximate causation.[20] Neither of these causation requirements is

5  present here. As already explained, Mr. Nathan's offense was not the "but-for" cause of Mr.

6  Lingham's loss. *See supra* at II.A.1. Nor has proximate cause been proven. Mr. Nathan and his father

7  were estranged from Mr. Lingham, and there is no evidence Nathan was aware of Lingham's

8  financial circumstances at the time of his investment in Baseline Agent. Dkt. 220 RT 43:12-44:4.

9  Thus, it was not reasonably foreseeable to Mr. Nathan that the loss of this investment would cause

10  Lingham substantial financial hardship.

11  Accordingly, the substantial financial hardship portion of the U.S.S.G. § 2B1.1(b)(2)(A)(iii)

12  enhancement does not apply. Because Mr. Nathan did not cause substantial financial hardship, he is

13  entitled to the 2-point downward adjustment for zero-point offenders under U.S.S.G. § 4C1.1.

14  **C.    Mr. Nathan should receive a partial acceptance of responsibility adjustment.**

15  Mr. Nathan should receive a one-point adjustment for acceptance of responsibility under

16  U.S.S.G. § 3E1.1(b). The increase in his offense level by one point solely because he put the

17  government to its burden of proof at trial is an unconstitutional penalty imposed on Mr. Nathan's

18  Sixth Amendment right to trial.[21] The work of preparing for trial is precisely the burden the Sixth

19  Amendment places on the government should it wish to deprive someone of his or her liberty. A one-

20  point increase in the prospective Guidelines range is a substantial penalty that places undue pressure

21  on a defendant's exercise of his Sixth Amendment right, particularly where the decision to apply said

22  point is left entirely in the government's discretion.[22] Because § 3E1.1(b) unconstitutionally burdens

23  Mr. Nathan's right to trial under the Sixth Amendment, the PSR should include a one-point reduction

24  in total offense level, or the Court should vary downward by one level to compensate.

25

26

27  [20] *See United States v. Hicks*, 217 F.3d 1038, 1048–49 (9th Cir. 2000); *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020).

28  [21] *See United States v. Tavberidze*, 2025 WL 748354 (S.D.N.Y. Mar. 10, 2025).
[22] *Id.* at *5.

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

9

### III.    Objections to the PSR's findings of fact.

Rule 32 provides that, for "any … controverted matter," a sentencing court "must" either "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. Proc. 32(i)(3)(B). When a defendant makes a specific factual objection to a matter that will affect sentencing, the district court must rule on the objection and make "express" or "explicit" factual findings that resolve that objection. *United States v. Doe*, 705 F.3d 1134, 1153 (9th Cir. 2013) (quoting *United States v. Houston*, 217 F.3d 1204, 1208 (9th Cir. 2000)). Strict compliance with Rule 32 is required. *Id*. Here, Mr. Nathan has raised numerous objections to the PSR's findings of fact, which the PSR does not fully summarize or respond to. *See generally* Ex. A (Defense Objections); PSR at p. 20-22. Mr. Nathan respectfully requests that the Court resolve those factual objections at sentencing.

### IV.    Response to the government's objections.

The government seeks Guideline enhancements for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), and abuse of a position of trust under § 3B1.3. Probation has correctly concluded that these enhancements do not apply, and Mr. Nathan offers the following arguments in support of Probation's determinations.

#### A.    The sophisticated means enhancement does not apply.

Contrary to the Government's argument, the sophisticated means enhancement does not apply in light of the facts of this case. Application Note 9(B) to U.S.S.G. § 2B1.1(b)(10)(C) defines "sophisticated means" to encompass "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Two examples are given: First, "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." *Id*. Second, using "fictitious entities, corporate shells, or offshore financial accounts." *Id*.

The Government claims the enhancement applies here because Mr. Nathan used false documents, created a false website, and purported to have an employee named "Barry Goldberg." As Probation notes, "[f]alse documents, false communications to investors, and other false statements

1    relating to the success of his company are expected in this type of investor-fraud scheme." PSR at 20.

2    Such conduct does not warrant imposition of a two-level enhancement.

3        Courts generally apply the sophisticated means enhancement when a defendant takes actions

4    that require "particular skill" or knowledge.[23] For instance, where a defendant built "many different

5    kinds of skimming device . . . customized to fit each type of ATM that was targeted," and the devices

6    were technologically complex, the enhancement was found warranted.[24]

7        By contrast, the Relativity scheme involved only the most basic technological know-how. The

8    false documents Mr. Nathan supposedly produced, such as press releases and emailed newsletters,

9    were not particularly complex. And in 2025, anyone with internet access can make a false email

10   account and website. And far from being particularly sophisticated, Mr. Nathan's website and

11   promotional videos were notably amateurish.

12       Nor is this a case where the enhancement is appropriate because the defendant engaged in

13   sophisticated financial transactions that made detecting the offense particularly challenging.

14   Examples illustrate this point. In *Terabelian*, the defendant created several "synthetic identities" to

15   fraudulently apply for more than 100 COVID-19 relief loans.[25] Or in *Sorensen*, the defendant used

16   several shell companies, liquidated accounts in cryptocurrency, and placed small amounts of money

17   in numerous bank accounts to avoid IRS detection.[26] Similar examples abound.[27]

18       None of the conduct in this case even comes close to this level of sophistication. Relativity had

19   two bank accounts. There were no shell companies, cryptocurrency, or comprehensive synthetic

20   identities involved. To say that the sophisticated means enhancement applies in this case would be to

21   say it applies in nearly every fraud case. Thus, this Court should find that the two-level enhancement

22   for use of sophisticated means does not apply.

23

24   ---

25   [23] *United States v. Guldi*, 141 F.4th 435, 453 (2d Cir. 2025).

     [24] *United States v. Constantinescu*, 147 F.4th 299, 316 (2d Cir. 2025).

26   [25] *United States v. Terabelian*, 105 F.4th 1207, 1212 (9th Cir. 2024).

     [26] *United States v. Sorensen*, 148 F.4th 992, 998 (8th Cir. 2025).

27   [27] *See, e.g., United States v. Horob*, 735 F.3d 866, 872 (9th Cir.2013) (per curiam) (defendant left a "complicated and fabricated" paper trail that made it hard to uncover his fraud); *United States v. Aderinoye*, 33 F.4th 751, 755 (5th Cir.

28   2022) (defendant "created at least forty fraudulent bank accounts in the names of real and fictious persons and business entities . . . He then transferred the funds between those accounts and eventually to accounts in his true name and to . . . a shell corporation he maintained in Nigeria.").

**B.     The abuse of a position of trust enhancement does not apply.**

The Guidelines provide for a two-level enhancement where the defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense.[28] "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."[29] Examples of positions of trust include "an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination."[30]

All fraud involves a component of misplaced trust, but Mr. Nathan did not hold a fiduciary-like relationship with his victims. He was not posing as an investment advisor, doctor, attorney, or bank manager; he was the organizer and salesman for a sham company.[31] Every case cited by the government in its PSR objections involved a defendant operating as a fiduciary.[32]

Here, Mr. Nathan was found to be the principal organizer of a sham space travel company, who sought investments via untruthful website, promotional material, and company financial statements and then used those investments for his own personal expenses. Admittedly, by virtue of being a one-man operation, Mr. Nathan was subject to no managerial oversight, but this alone cannot give rise to the abuse of trust enhancement because he also did not occupy a position of public or private trust.  In *United States v. Jolly*, like here, the defendant was president of a sham company purporting to sell computer hardware and software.[33] He raised loans from investors and sent false statements to them, but the company existed only on paper and the money was used to pay for his personal expenses.[34] Because the transactions involved contractual rather than fiduciary obligations, the abuse

---

[28] *See* U.S.S.G. § 3B1.3
[29] U.S.S.G. § 3B1.3, cmt. n.1.
[30] *Id.*
[31] *United States v. Huggins*, 844 F.3d 118, 125 (2d Cir. 2016); *see also United States v. Jolly*, 102 F.3d 46, 47 (2d Cir. 1996).
[32] *United States v. Tat*, 97 F.4th 1155, 1163 (9th Cir. 2024)(a bank manager who used her position to circumvent large-sum transaction rules); *United States v. Groves*, 594 F. App'x 332, 334 (9th Cir. 2014) (impersonated investment brokers); *United States v. Barnes*, 125 F.3d 1287, 1292 (9th Cir. 1997) (impersonated doctor); *United States v. Stratos*, 775 F. App'x 352, 353 (9th Cir. 2019) (wealth manager).
[33] 102 F.3d 46 (2d Cir. 1996).
[34] *Id.* at 47-48.

of a position of trust enhancement did not apply. *Id.* Similarly, in *United States v. Huggins*, Huggins claimed he was the leader of sham oil and gem mining companies in order to solicit investments, but in fact simply pocketed the money.[35] Again, the abuse of a position of trust enhancement did not apply: although Huggins had sole discretion over the use of investor funds, he was merely a salesman for his sham investment scheme, not a fiduciary. *Id.*

By the government's broad reading of the abuse of trust enhancement, "[e]very small-scale fraud led by a single person would qualify for this enhancement because he or she was the principal organizer, irrespective of whether the organizer was acting in a fiduciary-like capacity or held a position of trust."[36] "Such a broad reading would transform this abuse-of-trust enhancement into a vehicle for double counting, relying on a necessary element of the crime as a basis for applying the enhancement."[37]

To the extent the government argues that the enhancement applies because Mr. Nathan "exceed[ed] or abuse[d] the authority of his . . . position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification," that is incorrect.[38] As an initial matter, Mr. Nathan's use of Mr. Garcia's information was not "without authority," as the Guidelines require. While the Guidelines do not specifically define the phrase "without authority," the examples in the application note – a DMV worker issuing false driver's licenses, the volunteer at a charitable organization stealing financial information from a donor, a hospital orderly stealing private patient information, make it clear that the enhancement only applies where the person whose information was used did not consent to such use.[39] Each example also affirms that the defendant must hold a special position of trust, not simply be the head of a sham private company.

There is nothing like that here. Mr. Nathan did not steal Mr. Garcia's name and social security number—he obtained this information from Mr. Garcia himself and Mr. Garcia knew that his contact information was in the bank record. Moreover, Mr. Garcia never affirmatively testified that he did not

---

[35] 844 F.3d at 125 (2d Cir. 2016).
[36] *Huggins*, 844 F.3d at 126.
[37] *Id.*
[38] U.S.S.G. § 3B1.3 App. Note 2(B).
[39] *Id.*

1   give permission for Mr. Nathan to open the bank account in his name. *See* Dkt. 221 RT 44; Dkt. 223

2   RT 70-72; Trial Exhibit 191. Although Mr. Garcia claimed he didn't have access to the accounts, any

3   claim that he was not aware of the account is unbelievable - his phone number was used for dual

4   factor authentication on transactions from the -3293 account *and the* -6208 account, and he admitted

5   he was the party performing the dual factor authentication required. Dkt 223 at 48-49; 78-79; Trial

6   Exhibits 519, 521 (both show Mr. Garcia's phone number 415-691-6774 as the primary contact

7   phone number associated with the accounts). The fact that the bank account was used to receive

8   fraudulent investments does not render the use of Mr. Garcia's identifiers "without authority."

9          Accordingly, the enhancement for abuse of a position of trust should not be applied.

10  **V.    A 24-Month sentence is appropriate based on the section 3553(a) Factors.**

11         "The overarching statutory charge for a district court is to impose a sentence sufficient, but not

12  greater than necessary" to achieve the goals of § 3553(a).[40] Those goals include the need to: (1)

13  reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for

14  the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further

15  crimes of the defendant; and (6) provide the defendant with needed educational or vocational

16  training, medical care, or other correctional treatment in the most effective manner.[41] Section 3553(a)

17  also directs the Court to consider additional factors, including: the nature and circumstances of the

18  offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

19  sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

20  Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

21  3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

22         In this case, a 24-month sentence would be sufficient but not greater than necessary to achieve

23  the sentencing goals of §3553(a).

24  **A.    A below-Guidelines sentence is appropriate in this case.**

25         As an initial matter, *any* prison sentence will serve the purpose of general and specific

26  deterrence. Mr. Nathan is 43 years old and has never been to prison—this is his first offense. The

27  ───────────────

28  [40] *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted).
    [41] *See* 18 U.S.C. § 3553(a)(2).

only time he has ever spent in custody was in connection with this case. The impact that

incarceration, in addition to eight felony convictions, will have on Mr. Nathan's life cannot be

overstated. Thus, a 24-month sentence will specifically deter Mr. Nathan from reoffending. 18 U.S.C.

§ 3553(a)(2)(B). In addition, a 24-month sentence would enable Mr. Nathan to provide restitution to

the victims in a more timely manner. 18 U.S.C. § 3553(a)(7).

Such a sentence is also sufficient to create general deterrence. As other sentencing courts have

recognized, there is substantial empirical evidence that "even relatively short sentences" have "a

strong deterrent effect on prospective 'white collar' offenders."[42] For instance, in a new

comprehensive study of the Finnish justice system between 1992 and 2018, researchers determined

that white collar defendants sentenced to prison were **42.9%** less likely to reoffend in the three years

post-sentencing. [43] Even more striking, the *colleagues* of fraud defendants sentenced to prison were

**27% less likely** to commit a financial crime in the year after the defendant was sentenced to prison.[44]

This occurred even though **85% of all defendants received a sentence length of a year or less**, *with*

the average prison sentence being only **77 days**.[45] This is because "[w]hite-collar and regulatory

offenders are more likely to be deterred, even by . . . modest penalties; such offenders have many

lawful alternatives and much to lose from being convicted, regardless of the penalty."[46]

The data shows that short sentences are sufficient to deter white-collar offenders. But as the

next section explains, the Guidelines loss enhancements often have an immensely outsized effect on

the total offense level, resulting in Guidelines recommendations that vastly overpunish defendants.[47]

---

[42] *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); Richard Frase, *Punishment Purposes*, 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998).
[43] Huttunen, Kristiina, et al., *Punishing Financial Crimes: The Impact of Prison Sentences on Defendants and Their Colleagues*, *American Economic Journal: Economic Policy* p. 2, available at https://law.stanford.edu/wp-content/uploads/2025/09/EmilyNix_FullPaper-1.pdf.
[44] *Id.* at 23.
[45] *Id.*
[46] Frase, *Punishment Purposes*, 58 Stanford L.Rev. at 80.
[47] *See Adelson*, 441 F. Supp. 2d at 509 ("[T]he Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.") (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

### B.    Additionally, a below-Guidelines sentence is necessary because the Guidelines loss enhancements overpunish defendants like Mr. Nathan.

The Guidelines loss enhancements produce an excessive sentence because they are based on a provision that is inconsistent with the entire premise of the Sentencing Guidelines. The purpose of the Sentencing Guidelines was to bring predictability and uniformity to federal sentencing by creating guidelines based on empirical data, drawn from past practice of federal sentencing courts throughout the United States. But from their inception, the fraud guidelines were anomalous in that they did not reflect the Sentencing Commission's data on the sentencing practices of courts throughout the nation.[48]

The loss table offense levels were instead set higher than national sentencing trends, on the belief that longer sentences would serve as a general deterrent. After promulgating this higher-than-normal set of Guidelines, the Commission amended the Guidelines several times to increase the loss-based enhancements.[49] The enhancements have been increased in a "one-way upward ratchet increasingly divorced from considerations of sound public policy and even from the commonsense judgments of frontline sentencing professionals who apply the rules."[50] These changes were made despite the fact that no empirical evidence supported the deterrence theory on which they were purportedly based. *See infra* at V.A. (explaining that empirical evidence demonstrates than even short sentences substantially deter fraud defendants).

Sentencing courts have tremendous discretion to disagree, on policy grounds, with Guidelines recommendations.[51] With respect to sentences in fraud cases, courts have frequently exercised that

---

[48] *See* Mark W. Bennett, et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 950-51 (2017) (explaining that the Commission intentionally crafted the initial guidelines to require more severe punishment than had historically been the case for white-collar offenses).

[49] *Id.* at 952-53; *see also* Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis,* 105 Colum. L. Rev. 1315, 1319-20 (2005).

[50] *Id.* at 1319-20; *see also* Frank O. Bowman, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 168, 2008 WL 2201039 (2008); *United States v. Gupta,* 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd,* 747 F.3d 111 (2d Cir. 2014) (explaining that the Guidelines amendments from 1987 to 2003 would increase a hypothetical offender's range by more than 500%, without any explanation for why the offense was "500% worse in 2003 than it was in 1987").

[51] *See Kimbrough v. United States,* 552 U.S. 85, 109-110 (2007) (holding that when a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," or fails to "take account of empirical data and national experience," the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case.") (cleaned up).

1 discretion, rejecting the outsized loss enhancements in § 2B 1.1 because they are not based on

2 empirical data.[52]

3        Federal judges across the nation routinely sentence defendants convicted of financial fraud to

4 sentences that are below the recommended Guidelines range—often substantially so. Nationally, **60%**

5 of defendants convicted of fraud, theft, or embezzlement receive sentences below their Guidelines

6 range.[53] And while for other offenses the average downward departure is 35.1%.[54] in cases that

7 involve fraud, theft, or embezzlement, the average downward reduction is significantly higher—

8 **51.4%.**[55] In this case, under the guideline range as calculated by Probation (51-63 months), which

9 includes the nearly $600,000 Baseline Agent alleged loss, the average sentence imposed nationwide

10 between 2020 and 2024 was a substantially lower 40 months. PSR ¶ 88. Taken together, this data

11 strongly suggests that "the judiciary sees a consistent disjunction between the sentences prescribed by

12 the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that

13 judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives."[56]

14        To be clear, Mr. Nathan is not suggesting that the loss he caused is irrelevant to culpability.

15 Instead, the defense asks only that the Court recognize that the loss enhancement alone provides an

16 enormous increase in the sentence that is not justified by data reflecting actual sentencing practices.

17

18 _____

19 [52] *See, e.g., Gupta,* 904 F. Supp. 2d at 351 (imposing a below-Guidelines sentence of 24 months' imprisonment on
20 defendant who caused $5 million in loss, due to inadequacy of the Guidelines); *Adelson,* 441 F. Supp. 2d at 509
(imposing below-Guidelines sentence and criticizing "the inordinate emphasis that the Sentencing Guidelines place in
21 fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord
such huge weight to [this] factor[ ]"); *see also* Derick R. Vollrath, *Losing the Loss Calculation: Toward a More Just*
22 *Sentencing Regime in White-Collar Criminal Cases,* 59 Duke L. J. 1001, 1035 (2010) ("Early cases indicate that appellate
courts are upholding the decisions of sentencing judges who, based on policy concerns, apply *Kimbrough* to deviate from
23 the white-collar crime Guidelines. If this trend continues, courts could begin to move away from the Guidelines'
distracting and destructive emphasis on the loss calculation and toward sentences designed to achieve the purposes set
24 forth in § 3553(a).").
[53] U.S. Sentencing Commission, *Sentence Imposed Relative to the Guideline Range by Type of Crime*, Datafile, 2023,
25 available https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-
andsourcebooks/2023/Table31.pdf.
26 [54] U.S. Sentencing Commission, *Extent of Downward Variances by Type of Crime*, Datafile, 2023, available at
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2023/Table40.pdf.
[55] *Id.*
27 [56] Bowman, *Sentencing High-Loss Corporate Insider Frauds*, 20 Fed. Sent. R. at 169, 2008 WL 2201039, at *4 (Feb.
2008); *see also* Bennett et al., *Judging Federal White-Collar Fraud Sentencing*, 102 Iowa L. Rev. at 963-64 (statistics
28 showing that as guidelines range increases based on loss, there is an increasing divergence with the sentence actually
imposed).

### C.    The additional enhancements urged by the government are unfairly cumulative.

If the Court were to find the enhancements urged by the Government applicable, the result would be a four-level increase in the advisory Sentencing Guidelines range. This could increase Mr. Nathan's sentencing range by years. Such an increase is not supported by data, nor are they a fair reflection of Mr. Nathan's culpability.

In its Fifteen Year Report, the Sentencing Commission acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."[57] Both courts and commentators have acknowledged that this "factor creep" results in advisory ranges for fraud that are too high.[58] For instance, U.S. District Court Judge Mark Bennett has observed that "many federal judges, scholars, and practitioners" share the view that "§ 2B 1.1's narrow focus on monetary loss, when combined with the use of numerous overlapping enhancements (which are often an inappropriate measure of culpability), has resulted in unusually long sentences for first-time fraud offenders."[59]

These criticisms apply directly to the Guidelines calculation in Mr. Nathan's case. For instance, the twelve-point loss enhancement already reflects the sophistication and scale of the offense. The Guidelines would add another two points because the scheme was "sophisticated"—but most frauds causing $300,000 in loss are somewhat sophisticated. The enhancements urged by the government "have the effect of punishing the defendant over and over for the same basic thing— conducting a big fraud in a corporate setting."[60] Thus, to the extent this Court finds the enhancements applicable, it should nonetheless discount the increase in the Guidelines range as unduly cumulative.

In sum, because a Guidelines sentence would excessively punish Mr. Nathan, a downward

---

[57] U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing,* Chapter 5 at 137 (Nov. 2004), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/chap5.pdf

[58] *See, e.g.*, *Adelson*, 441 F. Supp. 2d at 510 (noting the guidelines have "frequently been criticized" for this "piling-on of points") (cleaned up); Bowman, 20 Fed. Sent'g R. at 170 ("[m]any factors for which loss already was a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself").

[59] Bennett et al., *Judging Federal White-Collar Fraud Sentencing*, 102 Iowa L. Rev. at 981-82 (cleaned up).

[60] Bowman, 20 Fed.Sent.R. at 171.

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

1  variance is warranted in this case. Factoring in the totality of the circumstances, a sentence of 24

2  months is sufficient in this case to satisfy the goals of sentencing, without being excessive.

3  **VI.    Restitution**

4      Under the Mandatory Victims Restitution Act (MVRA), which applies "in all sentencing

5  proceedings for convictions of ... an offense against property under this title ... including any offense

6  committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), a court must order restitution to each

7  victim in the full amount of the victim's losses, 18 U.S.C. § 3664(f)(1)(A). Because "[t]he purpose of

8  restitution is to put the victim back in the position he or she would have been but for the defendant's

9  criminal conduct," *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010), the "amount of

10  restitution is limited to the victim's 'actual losses' that are a direct and proximate result of the

11  defendant's offense," *United States v. Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016) (quoting *United*

12  *States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015)). Actual loss represents the difference between

13  "(1) the loss [the victim] incurred because of the unlawful conduct, [and] (2) the loss the [victim]

14  would have incurred had [defendant] acted lawfully." *United States v. Bussell*, 504 F.3d 956, 965 (9th

15  Cir. 2007). The Government must establish the proper amount of restitution by a preponderance of

16  the evidence.[61]

17      Additionally, Mr. Lingham's loss is not compensable in restitution. The Mandatory Victims

18  Restitution Act ("MVRA") provides that where the offense of conviction "involves as an element a

19  scheme," restitution must be awarded to "any person directly harmed . . . in the course of *the*

20  scheme."[62] The use of the pronoun "the" clearly indicates that this language refers to the scheme

21  underlying the conviction. Here, the indictment charged Mr. Nathan with defrauding investors in

22  *Relativity* by making misstatements to induce investments in *Relativity*. *See* Dkt. 1 at ¶¶ 8, 13. But

23  Mr. Lingham was not harmed in the course of the Relativity scheme. Because Mr. Lingham was not

24  harmed in the course of the scheme of conviction, he is legally ineligible for restitution under the

25  MVRA.

26

27

28  [61] 18 U.S.C. § 3664(e).
    [62] 18 U.S.C. § 3663A(a)(2) (emphasis added).

DEFENDANT'S SENTENCING MEMORANDUM
*NATHAN*, CR 19–34 VC

1

**VII.  Supervised Release**

2        Pursuant to the recent amendments to the Guidelines, this Court should impose a one-year term

3  of supervised release rather than the three-year term recommended by Probation. See PSR Sent. Rec.

4  at 1.  Before the amendments, supervised release was often imposed reflexively, with minimal

5  consideration of whether it was truly necessary for the defendant.[63] The Commission has now

6  rejected that approach and emphasized that judges must conduct an "individualized assessment" to

7  determine whether supervised release is truly needed and if so, for how long.[64] These changes are

8  intended to ensure that individuals "who will need post-release supervision will receive it while

9  preventing probation system resources from being wasted on supervisory services for releasees who

10  do not need them."[65]

11        Here, the three-year term of supervised release recommended by Probation is longer than

12  necessary. The length of the supervised release term is to be determined by reference to the 18 U.S.C.

13  § 3553(a) factors that courts must consider under 18 U.S.C. § 3583(c).[66] As relevant here, this is Mr.

14  Nathan's first offense.[67] Mr. Nathan does not have a substance abuse problem, nor is he in need of

15  psychological or psychiatric treatment.[68] A one-year term of supervision will allow the Court to

16  oversee his transition from custody and into the community. Should any issues arise during that year,

17  this Court can extend the term of supervised release as needed.[69]

18

19  //

20  //

21  //

22

23

24  ──────────────────

25  [63] See U.S.S.G. Amendment 835, Reasons for Amendment, available at https://www.ussc.gov/guidelines/amendment/835.

26  [64] Id.
    [65] Id. (cleaned up).

27  [66] See U.S.S.G. § 5D1.2, App. Note 1, referencing § 5D1.1, App. Note 1.
    [67] See U.S.S.G. § 5D1.1, App. Note 2 ("the more serious the defendant's criminal history, the greater the need for
    supervised release.").

28  [68] U.S.S.G. § 5D1.1, App. Note 3 & 5.
    [69] U.S.S.G. § 5D1.2, App. Note 6.

**CONCLUSION**

For the reasons set forth above, Mr. Nathan respectfully requests that the Court sentence him to 24 months in custody, followed by 1 year of supervised release, an $800 special assessment, and $307,227.72 in restitution.

Dated:     November 5, 2025           Respectfully submitted,

                                          JODI LINKER
                                          Federal Public Defender
                                          Northern District of California

                                                   /S
                                          GABRIELA BISCHOF
                                          Assistant Federal Public Defender

//

//